# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LEMI-OLA ERINKITOLA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 07 C 1145 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| BLUE CROSS BLUE SHIELD ASSOCIATION, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Lemi-Ola Erinkitola has filed a § 1981 and Title VII employment discrimination and retaliation lawsuit against Defendant Blue Cross Blue Shield Association ("BCBSA"). BCBSA has responded with two motions that are now before the court. BCBSA first filed a Rule 11 sanctions motion, alleging that allegations appearing in paragraphs 27 and 28 of the complaint, Erinkitola's claim of retaliation, and her claim of constructive discharge, are frivolous. BCBSA then moved for summary judgment on all counts.

### BACKGROUND[1]

Erinkitola was hired by BCBSA in 2000 as a Senior Consultant, a Job Grade Level 13. In 2002, she was promoted to Manager of Provider Relations, a Job Grade Level 14. Erinkitola had primary responsibilities for providing tools and services to educate providers (*i.e.*, hospitals or doctors) about BCBSA's service plans. During this time Erinkitola also had a "direct report," that is, a person who worked for her, and who assisted her in completing her tasks. Erinkitola reported to Melanie Tillmans.

---

[1] The following facts are not in dispute, and are taken from the parties' Rule 56.1 statements. The many material facts that *are* in dispute are discussed in greater detail in the appropriate section of legal analysis.

Erinkitola's performance was evaluated in 2003, 2004, and half-way through 2005. Other evaluations, especially prior to 2003, may have occurred, but are not in the record. In 2003 her overall rating was 3.59 points out of a possible 5. In 2004, her rating was 3.25 points. To put these and later scores in context, BCBSA's Rating Guidelines provide that a "3.00" indicates that the employee's performance "generally meets and sometimes exceeds standards / expectations," that the employee's performance is "steady and reliable," that the employee is "fully competent in this particular Key Responsibility, Goal Project or Performance Criteria category," and that the employee achieves "between 90%–110%[2] of the expectation for this [area]." The court further notes that the section titled "Manager's Overall Comments" in the 2004 review is unequivocally positive, noting that Erinkitola "very effectively manages her area and her own work." *See* App'x to Def.'s Local R. 56.1(a)(3) Stmt. of Material Facts (hereinafter "Def. App'x") Ex. 54 at BCBSA 0803.

In 2005, BCBSA went through a reorganization. Erinkitola was assigned to a new Customer Relations team, where she was supervised by Diana Duffy, and Duffy's supervisor was Kari Hedges. Erinkitola was transferred to the new team on about June 1, 2005 and prior to the transfer Tillmans performed an interim evaluation, giving Erinkitola a score of 3.05. Erinkitola did not sign this evaluation.

After Erinkitola joined her new team in June 2005, her direct report was removed, though two other employees who were also now reporting to Duffy—Kevin Einbinder and Thomas Conway—retained their direct reports. In July 2005, Duffy left for maternity leave, and Duffy gave Erinkitola (and others) a list of projects to be completed during her absence. From July 2005 to October 2005, Erinkitola reported to Hedges. During this time, both Hedges and Duffy became concerned over the lack of progress Erinkitola was making on her projects.

---

[2] The significance of "110%" is not clear from the record.

2

BCBSA utilizes what it refers to as a Performance Improvement Plan ("PIP") to address certain employee performance issues. The PIP begins with a "Documented Warning," which involves a written statement to the employee outlining areas of concern, and goals and tasks to improve the problem. A Documented Warning period can last 30 or 60 days. A Documented Warning is required if an employee has a rating of less than 2.0, and can be recommended if an employee has a rating of between 2.0 and 2.6. At the end of the Documented Warning period, an employee can be terminated, can be given a Final Warning if problems persist, or can be taken off the PIP if the PIP was deemed successful. An employee may be offered the chance to resign when a Final Warning is issued, though BCBSA's policy does not require this. A Final Warning generally lasts for 30 days, and results in either removal from the PIP, or termination. Both Documented Warnings and Final Warnings are supposed to involve not only a plan for improvement, but also feedback from, and meetings with, the employee's supervisor. Any termination must involve consultation with BCBSA's Human Resources department.

When Duffy returned in October, she, in consultation with Human Resources, placed Erinkitola on an informal PIP,[3] starting October 12, 2005, due at least in part to concerns over Erinkitola's performance on the projects she had been assigned. After the informal PIP, Erinkitola started a formal PIP on November 16, which was to run 60 days, until January 14, 2006.

On December 1, 2005, Erinkitola filed a charge of racial discrimination with the Equal Employment Opportunity Commission ("EEOC"). On December 22, 2005, Erinkitola worked her last day at BCBSA. After December 22, 2005, Erinkitola took days off pursuant to paid time off

---

[3] The precise distinction between a "formal" and "informal" PIP is not provided in the record.

("PTO") or a medical leave, due to a stress-related illness. On January 11, 2006—the date Erinkitola was to return from her medical leave—Erinkitola submitted a letter of resignation.

## ANALYSIS

### I. BCBSA's Motion for Summary Judgment on Race Discrimination

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). However, all facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008).

Plaintiffs in Title VII and § 1981 actions[4] must show discrimination due to race by utilizing the burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The plaintiff must first establish a prima facie case of discrimination by demonstrating that: (1) she belongs to a protected class, (2) she performed her job according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside the protected class were treated more favorably by the defendant. *See, e.g.*, *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001). When the plaintiff satisfies this initial burden, it is then upon the defendant to proffer a legitimate and non-discriminatory reason for the termination. *Id.* After this, the burden returns to the plaintiff to show that the stated reason is a mere pretext for discrimination. *Id.*

---

[4] The methods for proving discrimination claims under Title VII and 42 U.S.C. § 1981 are the same. *Humphries v. BCOCS West, Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007).

4

The parties agree that Erinkitola belongs to a protected class as an African American. The other elements are in dispute, and will be considered shortly. However, the second element—whether Erinkitola performed her job according to BCBSA's legitimate expectations—involves an analysis of the same factors that will be considered when examining whether there is pretext, *i.e.*, whether (or not) Erinkitola was meeting BCBSA's legitimate expectations will bear directly on the issue of whether (or not) the basis for her firing—that she was *not* meeting expectations—is a mere pretext. *See Gordon*, 246 F.3d at 886 & n.9. These issues will be considered together.

Finally, it must be emphasized that the driving claim in this lawsuit is that of constructive discharge, which requires proof that Erinkitola resigned due to discriminatory harassment, or because her employer acted "in a manner so as to have communicated to a reasonable employee that she will be terminated." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (quoting *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002)). The inquiry into what a reasonable employee would do inherently involves consideration of numerous questions of fact, and unsurprisingly there is general agreement by the courts in this district that this issue is ill-suited to disposition at summary judgment, except for the rare circumstance where the employee's decision to resign is unreasonable as a matter of law. *See*, *e.g.*, *Cottle v. Optimus, Inc.*, No. 95 C 2749, 1996 WL 467226, at *6 (N.D. Ill. Aug. 15, 1996) (Manning, J.); *Howard v. Burlington Air Exp. Inc.*, No. 93 C 7815, 1994 WL 722061, at *3 (N.D. Ill. Dec. 29, 1994) (Kocoras, J.); *Thames v. Maurice Sporting Goods, Inc.*, 686 F.Supp. 208, 212 (N.D. Ill. 1988) (Shadur, J.); *Bailey v. Binyon*, 583 F.Supp. 923, 929 (N.D. Ill. 1984) (Plunkett, J.); *Bernstein v. Consol. Foods Corp.*, 622 F.Supp. 1096, 1101 (N.D. Ill. 1984) (Rovner, J.). This general approach holds true for the case at bar.

A. Legitimate Expectations of BCBSA

BCBSA's position in this case is very straight-forward. As BCBSA tells it, "after being placed in a new position as a result of a reorganization within her department in June 2005, Erinkitola could not keep up with the demands of her new job." Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. 2 (Doc. No. 38). At this stage too many of the material facts that would support this position are in dispute for BCBSA to prevail on summary judgment.

All parties agree that Erinkitola's annual reviews had declined from 2003 through her interim review in 2005, and all agree that Erinkitola did not complete the tasks assigned to her during both the informal PIP and the formal PIP. However, they disagree sharply over the significance of, and reasons for, these declining reviews and failings in completing the PIPs. Erinkitola first observes that she never received a review below a 3.00, which according to BCBSA's own standards means that throughout her career, Erinkitola at a minimum "generally [met] and sometimes exceed[ed] standards/expectations."

While Erinkitola admits that her 2005 interim review was lower than in the past and was a 3.05, she sharply disputes that this review was accurate, or even that it was appropriate for her to have received a mid-year review. BCBSA claims this was a standard process that occurred any time a person was transferred between managers. Erinkitola disagrees, pointing out that others who were newly reporting to Duffy did not have to undergo a mid-year review—namely, Einbinder and Conway.[5] Erinkitola further states in her deposition that Tillmans—who conducted the review—told Erinkitola that: (1) she was doing the review only because Duffy had asked for it; (2) the resulting

---

[5] The parties agree that Einbinder's and Conway's job descriptions and direct reports did not change after the reorganization, but there is no dispute that Einbinder and Conway did not report to Duffy before the reorganization, which is the issue in contention regarding why Erinkitola received a mid-year performance review. *See* Duffy Dep. 28:19–29:03 (Def. App'x Ex. 3).

6

number (3.05) was not based on Erinkitola's work but rather on Tillmans' conversation with Duffy; (3) the review was not based on any particular rationale; and (4) Tillmans advised Erinkitola not to sign the review because of its inaccuracies. From this, Erinkitola concludes that Duffy was intentionally causing Erinkitola to receive a low score to justify placing her on a PIP. Though there is no direct evidence of this, and though BCBSA claims the informal PIP was commenced due to Erinkitola's failure to perform adequately on the projects she had been assigned, a reasonable juror could construe these facts to find that an ulterior motive existed.

Erinkitola was placed on an informal PIP by Duffy, which Erinkitola points out would appear to contradict BCBSA policy; the policy states that employees with a rating of 2.0–2.6 *may* be placed on a PIP, but Erinkitola's rating was never this low. However, both parties also agree that a supervisor can initiate a PIP whenever an employee's performance requires it.

Erinkitola states in her deposition that while the informal PIP was ongoing, Duffy stated that she would move forward with the formal PIP regardless of whether Erinkitola met the goals of the informal PIP.[6] Duffy also repeatedly canceled the mandatory one-on-one meetings that are required during PIPs. Finally, Erinkitola asserts that Duffy stated that Erinkitola would not meet Duffy's expectations even though she was meeting the goals of the PIP.[7]

---

[6] BCBSA denies this fact, citing to a memorandum memorializing commencement of the formal PIP (which is dated November 16, 2005, after the informal PIP ended), and to some statements from Erinkitola's deposition that suggest Duffy made similar statements *after* the formal PIP ended. Def.'s Resp. to Pl. Stmt. of Add'l Facts ¶ 17 (Doc. No. 48). The November 16 memorandum is immaterial—it does not address what Duffy did or did not say while the informal PIP was underway. The references to Erinkitola's deposition also do not directly contradict her very clear statement that Duffy made these statements before the informal PIP ended. *Compare* Erinkitola Decl. 168:21–169:03 (Def. App'x Ex. 4) *with* Erinkitola Decl. 207–08. This fact is therefore disputed.

[7] BCBSA denies that Duffy made this statement *after December 1, 2005*, but does not appear to deny that the statement was made earlier. The accuracy of this statement is in dispute.

These factual disputes are central to determining both whether Erinkitola was meeting the legitimate expectations of BCBSA, and also whether the purported basis for placing Erinkitola on a PIP were legitimate or pretextual. Because these facts are in contention, summary judgment on this issue is unwarranted.

      B.      Adverse Employment Action / Constructive Discharge

Constructive discharge constitutes an adverse employment action. *Fischer*, 519 F.3d at 408–09. To prevail on a claim for constructive discharge, a plaintiff must either show that she resigned due to discriminatory harassment, which requires proof of "a discriminatory work environment 'even more egregious than the high standard for hostile work environment'"; or that she resigned because her employer acted "in a manner so as to have communicated to a reasonable employee that she will be terminated." *Id.* at 409 (quoting *Univ. of Chi. Hosps.*, 276 F.3d at 331). Erinkitola is proceeding primarily under the second theory. *See* Pl. Mem. in Opp. to Def.'s Mot. for Summ. J. 8 (Doc. No. 43).

As already noted above, the inquiry into what a reasonable employee would do inherently involves consideration of numerous questions of fact, as is true here. It is undisputed that Erinkitola went through an informal PIP and then a formal PIP. It is undisputed that Erinkitola could be terminated at any time during the PIP, but that termination would generally occur only after the PIP was completed and a Final Warning is issued. Erinkitola testified at her deposition that Duffy repeatedly told her that Erinkitola would not meet Duffy's "expectations," even though Erinkitola was meeting the "goals" of the PIP.[8] The parties furthermore agree that "Erinkitola resigned from BCBSA because of Duffy's threats of insubordination and termination, and because Duffy repeatedly told her that she would not meet her expectations even though she was meeting the goals

---

[8] As noted *supra* in footnote 7, this fact is disputed.

8

outlined in the formal PIP, and also because the conditions at work were impacting Erinkitola's health." *See* Def.'s Resp. to Pl. Stmt. of Add'l Facts ¶ 31 (Doc. No. 48). On this record, it is impossible to conclude definitively that Erinkitola had no fear of termination.

BCBSA argues that even if there were a basis for Erinkitola to have feared termination, Erinkitola must show that such termination would be "imminent," and she has failed to do so. BCBSA cites to *EEOC v. University of Chicago Hospitals.*, 276 F.3d 326 (7th Cir. 2002), where an employee's office had been converted into a storage area, her belongings had been packed into boxes, and others had informed her that the supervisor was intending to terminate her. *Id.* at 331–32. BCBSA also cites to *Cigan v. Chippewa Falls School District*, 388 F.3d 331 (7th Cir. 2004), which held that "the prospect of being fired at the conclusion of an extended process" is not sufficient. *Id.* at 334. In *Cigan*, a teacher sent a letter of resignation more than six months before the end of the academic year, when the resignation would become effective. She did so after the superintendent told her once that he did not plan to renew her contract. The ultimate decision was not the superintendent's, however, and the teacher forewent numerous opportunities to respond to the superintendent's concerns—including by working to address the issues raised by the superintendent, by presenting her case to the school board (which would have been necessary prior to her termination), or by utilizing settlement procedures available through the teacher's union and the Americans with Disabilities Act. *Id.* at 333.

While *University of Chicago Hospitals* provides an egregious example of constructive discharge, it does not establish a minimal level of proof that all future plaintiffs must now satisfy to prevail. *See, e.g.*, *Fischer*, 519 F.3d at 411 (noting that transfer that sets a plaintiff on a indirect, but eventual "dead-end path towards termination" is sufficient to establish case of constructive discharge). Erinkitola's case falls somewhere between *Cigan* and *University of Chicago Hospitals*.

9

A reasonable juror could find that Erinkitola had made efforts to improve herself, but was repeatedly rebuffed by Duffy, and was advised that she would never be able to meet Duffy's expectations even if she met the technical goals of the PIP. A reasonable juror could conclude that Duffy told Erinkitola that she would have to undergo a formal PIP even before the informal PIP was completed. These facts can be read to establish that Erinkitola knew that her failure was inevitable—it may not have happened on the day that she was to return to work, but it would have happened at some point in the near future.[9]

Because material facts on the issue of constructive discharge remain in dispute, BCBSA's motion for summary judgment on this element is denied.

C. Treatment of Similarly Situated Employees

Erinkitola must also show that similarly situated employees who are not members of the protected class were treated more favorably. *Gordon*, 246 F.3d at 886. Erinkitola points to two fellow non-minority employees who also reported to Duffy during the time in question—Einbinder and Conway. Erinkitola points out that neither of them was subjected to an interim review in 2005, and that neither of them lost his direct report. BCBSA responds that Einbinder was placed on a PIP about six months after Erinkitola ended her time with BCBSA, and that both Einbinder and Conway had additional work demands which justified their direct reports, while Erinkitola did not.

---

[9] BCBSA separately argues that Erinkitola's claim for constructive discharge is barred because Erinkitola made several statements indicating she wished to retain her job, including an email on December 22, 2005, just before she took medical leave, stating that she valued her job and wanted to continue working. BCBSA appears to be arguing that, since Erinkitola valued her job and wanted to return, the job could not have been so intolerable as to support a constructive discharge claim. This is baseless. First, BCBSA misapprehends the theory that Erinkitola is pursuing—she is focusing primarily on an "inevitable termination" approach. Second, BCBSA misapprehends the concept of constructive discharge. Erinkitola's claim is premised on the notion that she did value her job, did want to return to work, and would not have resigned but for the discriminatory and harassing treatment she is alleged to have received from Duffy. Nothing in her December 22 email contradicts this point.

At this stage, Erinkitola has met her burden and can proceed. There is no dispute that Erinkitola was subjected to certain events that Einbinder and Conway were not, though the parties disagree as to the reason for these disparities. That is a matter of fact, and cannot be decided at this stage.

## II. BCBSA's Motion for Summary Judgment on Retaliation

Erinkitola has also pled a retaliatory constructive discharge claim. *See* Compl. Count III. To prevail on a retaliation claim, a plaintiff can choose to proceed under the direct or indirect approach.[10] The direct approach requires proof that the plaintiff engaged in protected activity, that she suffered retaliation by the employer, and that there was a causal connection between the two. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (quotations omitted). The indirect method requires proof that the plaintiff: (1) engaged in a statutorily protected activity; (2) met the employer's legitimate expectations; (3) suffered an adverse action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.*

Erinkitola engaged in a statutorily protected activity—she filed an EEOC charge alleging discrimination on December 1, 2005. There are material facts at issue regarding whether she met BCBSA's legitimate expectations. *See supra* Section II.A. There are material facts at issue regarding whether she suffered an adverse action (constructive discharge). *See supra* Section II.B. Neither Einbinder nor Conway engaged in statutorily protected activity, and there are material facts

---

[10] What constitutes "retaliation" under Title VII is broader than what constitutes "discrimination," in the sense that discrimination claims must be related to events that adversely affect the terms, conditions, or benefits' of employment, whereas retaliation claims can "extend[] beyond workplace-related or employment-related retaliatory acts and harm[s]" which are "materially adverse." *See Burlington No. & Santa Fe R.R. v. White*, 548 U.S. 53, 67–68 (2006); *see also id.* at 59–70 (explaining theory of this *Matthews v. Wis. Energy Corp. Inc.*, 534 F.3d 547, 558 (7th Cir. 2008) ("The logic is that an employee would be less likely to engage in statutorily protected activity—like suing for discrimination—if the employer could exact some sort of revenge outside of the workplace or when the employee changed jobs.").

at issue regarding whether she was treated less favorably than they were. *See supra* Section II.C. For these reasons, Erinkitola's claim of retaliation survives BCBSA's motion for summary judgment.[11]

## III. BCBSA's Motion for Sanctions

BCBSA has also filed a motion for Rule 11 sanctions against Erinkitola. There are two parts to BCBSA's motion. The first is that Erinkitola's claim for retaliation, based on events *prior to December 1, 2005*, is frivolous. The second is that Erinkitola's claim of constructive discharge is frivolous.

Taking the second of these arguments first, Erinkitola's claim of constructive discharge has survived summary judgment. *See supra* Section I.B. An argument is frivolous if it is "baseless or made without a reasonable and competent inquiry." *Berwick Grain Co., Inc. v. Ill. Dep't of Agric.*, 217 F.3d 502, 504 (7th Cir. 2000). Since Erinkitola's claim of constructive discharge has survived summary judgment, it is not frivolous.

BCBSA's claim regarding retaliation focuses on paragraphs 27 and 28 of the complaint, which allege that:

> 27.     ERINKITOLA complained to Human Resources in October and November 2005 that she found the PIP discriminatory and that neither of Ms. Duffy's white male employees was forced to work under those conditions.

---

[11] BCBSA observes that most events upon which Erinkitola relies happened prior to the December 1, 2005 EEOC filing, and argues pursuant to *Gates v. Catepillar*, 513 F.3d 680 (7th Cir. 2008), that if an employee engages in a statutorily protected activity halfway through a progressive disciplinary scheme, a claim of retaliation will fail. *Gates* is inapposite: Gates's claim failed because she did not show that she was satisfying the employer's legitimate expectations, *id.* at 689, but that issue is disputed here. *See supra* Section I.A. However, BCBSA's larger point is valid—events occurring prior to the statutorily protected activity are not relevant to whether Erinkitola's alleged constructive discharge was retaliatory.

12

28. After her complaint of discrimination, Ms. Duffy continued to assign ERINKITOLA an increasing amount of projects with unrealistic goals and time lines.

Compl. ¶¶ 27–28. BCBSA points to portions of Erinkitola's deposition which show that in October and November Erinkitola complained to Human Resources that she was being treated unfairly, but that she almost certainly did not reference her race in those conversations.

BCBSA's focus on paragraphs 27 and 28 is misdirected, for the actual retaliation count that appears in the Complaint—Count III—focuses unequivocally on Erinkitola's claim of constructive discharge, which happened *after* the EEOC charge was filed on December 1, 2005. However, to the extent that it is necessary to examine the specific text of paragraphs 27 and 28 and Erinkitola's deposition, they do not appear to be necessarily inconsistent. Paragraphs 27 and 28 refer to "discrimination," not "racial discrimination." In her deposition, Erinkitola states that she felt her PIP was "discriminatory," and that she "communicated [her] concerns" to the Human Resources department. Erinkitola Dep. at 162:7–14. (Def. Mem. in Supp. of Mot. for Sanctions, Ex. B (Doc. No. 29-2)). Erinkitola goes on in her deposition to make statements that cast doubt on whether she specifically referenced "race" during this conversation, but nowhere does she suggest that she failed to suggest that the PIP was discriminatory.

The purpose of Rule 11 is to deter baseless filings. *Johnson v. A.W. Chesterton Co.*, 18 F.3d 1362, 1366 (7th Cir. 1994). The sections of the Complaint that BCBSA highlights are not entirely baseless. BCBSA's motion seeking Rule 11 sanctions is denied.[12]

---

[12] In her response to BCBSA's Rule 11 motion, Erinkitola requests a sanction against BCBSA for filing the Rule 11 motion, claiming that the motion itself is frivolous. Although it appears that Erinkitola complied with Rule 11's 21-day safe-harbor provision—*see* April 16, 2008 Letter from Eugene Hollander to Beth Joffe (Def.'s Reply to Pl.'s Resp. to Def.'s Motion for Sanctions, Ex. B)—seeking sanctions in a response memorandum is not appropriate. Fed. R. Civ. P. 11(c)(2) ("A motion for sanctions must be made separately from any other motion . . . .").

## CONCLUSION

BCBSA's motion for sanctions is denied. BCBSA's motion for summary judgment is denied.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: February 11, 2009